**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **WESLEY MILLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:17-cv-01439** |
| | ) | **Judge Aleta A. Trauger** |
| **NANCY BERRYHILL, ACTING** | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY ADMINISTRATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Plaintiff Wesley Miller brings this action under 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of the Social Security Administration, denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act.

On November 8, 2018, the magistrate judge issued a Report and Recommendation ("R&R") (Doc. No. 22), recommending that the Commissioner's decision be affirmed and that the plaintiff's Motion for Judgment on the Pleadings and Administrative Record (Doc. No. 17) be denied. The plaintiff has filed timely Objections (Doc. No. 26), to which the defendant has responded (Doc. No. 31). For the reasons discussed herein, the court finds that the ALJ's decision is not supported by substantial evidence in the record. The plaintiff's Objections being well taken, the court will reject the R&R, enter judgment in favor of the plaintiff under sentence four of § 405(g), and remand the case to the Commissioner for further proceedings.

## I.     Procedural History

Miller filed his application for DIB on September 16, 2015, alleging disability beginning

on May 1, 2014 due to anxiety, panic attacks, insomnia, and depression. (Doc. No. 11, Administrative Record ("AR") 229, 239, 407.[1]) His application was denied initially on January 27, 2016 (AR 228) and on reconsideration on April 28, 2016 (AR 240). After a hearing on June 24, 2016, ALJ Troy M. Patterson denied the claim. (AR 258–60, 261–71.) The Appeals Counsel thereafter granted Miller's request for a review of the ALJ's decision and remanded for further proceedings. (AR 276–79.)

A second hearing took place on March 3, 2017 before ALJ Brian Lucas, at which the plaintiff, his wife, his mother-in-law, Michael Scott, MA, and a vocational expert all testified. (AR 33–203.) ALJ Lucas issued an opinion denying the claim for DIB on May 17, 2017. (AR 12–14.) ALJ Lucas accepted as a factual matter that Miller suffered from severe impairments, including affective disorder and anxiety disorder, but he found that these impairments did not meet or medically equal the criteria of listings 12.04 or 12.06. (AR 18.) He found that the plaintiff had moderate restrictions in understanding, remembering or applying information, in interacting with others, in maintaining concentration, persistence, or pace, and in adapting and managing himself in the area of personal hygiene. (*Id.* at 18–19.)

Having found that the claimant's mental impairments did not cause at least two marked limitations or one extreme limitation, the ALJ concluded that the "Paragraph B" criteria were not satisfied. (*Id.* at 19.) Likewise, he found that the claimant had not demonstrated a minimal capacity to adapt to changes in his environment or to demands not already part of his daily life and, therefore, that the "paragraph C" criteria were not satisfied. (*Id.*)

The ALJ concluded that Miller had the residual functional capacity to perform a full range of work at all exertional levels but with nonexertional limitations, including that he was

---

[1] Page number references to the administrative record are consistent with the Bates stamp number at the lower right corner of each page.

limited to (1) performing simple tasks; (2) interacting on an occasional basis with the general public, coworkers, and supervisors; and (3) adapting only to gradual or infrequent changes in the workplace. (*Id.*)

The ALJ found that the plaintiff had past relevant work as a laundry laborer, a medium, unskilled job the requirements of which fell within the claimant's residual functional capacity. In addition, the ALJ found that there were other jobs in the national economy that, taking into consideration his age, education, work experience, and residual functional capacity, the claimant could perform, including the jobs of industrial cleaner, nursery worker, and groundskeeper. Based on these findings, the ALJ determined that the claimant had not been under a disability at any time from May 1, 2014 through the date of the decision. (AR 26.)

The Appeals Counsel denied review on September 10, 2017 (AR 1–3), making the ALJ's decision the final decision of the Commissioner.

The plaintiff filed his Complaint initiating this action on November 7, 2017. (Doc. No. 1.) The Commissioner filed a timely Answer (Doc. No. 10), denying liability, and a complete copy of the Administrative Record (Doc. No. 11). On May 22, 2018, after several extensions of the deadline, the plaintiff filed his Motion for Judgment on the Administrative Record and supporting Memorandum of Law. (Doc. Nos. 17, 17-2.) The Commissioner filed a Response (Doc. No. 20), and the plaintiff filed a Reply (Doc. No. 21). On November 8, 2018, the magistrate judge issued his R&R (Doc. No. 22), recommending that the plaintiff's motion be denied and that the Commissioner's decision be affirmed.

Now before the court are the plaintiff's Objections to the R&R. (Doc. No. 26.) The Commissioner has filed a Response in opposition to the Objections. (Doc. No. 31.)

## II.     Factual Background

Plaintiff Wesley Miller underwent several surgeries in 2008 because of a burst appendix. He reported first experiencing depression around that time. He worked for a friend's welding supply store between 2008 and 2010. He worked part-time as a substitute teacher on and off from November 2010 through May 2015.

He became engaged to his now wife in March 2014. In May 2014, he moved from his parents' home in Roane County to Smyrna, Tennessee, to be near his fiancée and her family. He began a new job at the Stone Crest Medical Center in June 2014 in housekeeping but suffered terribly from anxiety, which he claims prompted him to quit after only a few weeks.

He first sought treatment for depression in the summer of 2014, from Nurse Practitioner Michelle McBride at the Primary Care & Hope Clinic in Rutherford County. He reported to McBride in June 2014 that he had experienced anxiety and depression for approximately six years, but it had become exacerbated shortly after he started the new job at the Medical Center. McBride diagnosed moderate depression and prescribed paroxetine (Paxil) and hydroxyzine hydrochloride (Atarax). (AR 755–57.) At a follow-up appointment a month later, the plaintiff reported that he had trouble waking in the morning or feeling motivated during the day. He had quit his job, as he believed that it was one of his major stressors. He did not feel that Paxil had helped his symptoms (AR 752), so McBride tried sertaline hydrochloride (Zoloft) instead. (AR 753.) In August 2014, the plaintiff reported that Zoloft had not improved his depression symptoms, though his anxiety was somewhat better. He wanted to stop the medication altogether to see how he did. He was getting married in two weeks and was hopeful that that would

improve his mood. (AR 749.) He also had started a new job substitute teaching,[2] which he liked. (AR 749.) McBride advised him how to taper off the medication. (AR 750.)

The plaintiff worked part-time as an on-call substitute teacher in Smyrna or Roane County from August 2014 through July 2015. He did not work enough for this attempt to qualify as substantial gainful employment under the Social Security regulations. In April 2015, he and his wife experienced a fire in their apartment building, which traumatized him. (AR 145–46.) His work as a substitute teacher or childcare worker essentially stopped after that, because he was "unable to get out of bed" much of the time. (AR 147.)

In July 2015, he and his wife moved to Oregon to care for her dying grandmother. This move also triggered an exacerbation of the plaintiff's symptoms of depression and anxiety. (AR 47–48, 147–48.) Mrs. Miller's grandmother died, and the couple returned to Tennessee after a month or two in Oregon. (*See generally* AR 553–54 (timeline).)

The plaintiff, then age 24, went to his treating pediatrician, Dr. Randy Denton, for a "preventive exam" in the spring of 2015. (AR 763.) The record does not reflect that Denton ever treated the plaintiff for depression while the plaintiff was a child, and the last time Denton actually treated the plaintiff for any condition before 2015 appears to have occurred in September 2011, but the record does not reflect the reason for the visit. (AR 784.) When he saw Miller in March 2015, Dr. Denton did not recall having seen him since he was "a preadolescent." (AR 766.) Dr. Denton's notes reflect that Miller reported that he was suffering from depression and anxiety that "sometimes interfere[] with his ability to work and function" (AR 766), that he had tried two antidepressants in the past but felt they made his condition worse, and that he was "struggling a lot to sleep." (AR 766.) Dr. Denton prescribed Cymbalta and instructed Miller to

---

[2] The treatment note says "student teaching," but the record indicates he worked as a substitute teacher. (*See, e.g.*, AR 749.)

follow up in six weeks. Dr. Denton saw him again on April 13, 2015, at which time Miller reported not liking how the Cymbalta had made him feel so he had stopped taking it. Denton reported that Miller was "feeling a lot better now," that his depression and anxiety "seem[ed] to be under control," and that the plaintiff was "in good spirits now." (AR 762.)[3] Denton's assessment was "Depression, improved." (AR 762.)

The record also includes an unsigned, undated, and apparently incomplete medical source opinion form ("MSO") (AR 840), which has been attributed to Dr. Denton, apparently because it was included among the records provided by his office. The MSO notes a diagnosis of depression and states that the practitioner treated the patient for 9 months, last saw him in April 2015, and had prescribed Cymbalta. The doctor rated the patient as having moderate impairments in the areas of memory, concentration, and social ability but does not indicate the basis for his assessment. (*Id.*)

The plaintiff was referred by his attorney for a psychological assessment by James Michael Scott, M.A. (Senior Licensed Psych. Examiner) and David L. Terrell, Ph.D. (Licensed Clinical Psychologist), in October 2015. During this assessment, the plaintiff was administered a number of tests, including the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"). According to Scott's and Terrell's report ("Scott/Terrell Report"), the MMPI-2 showed no malingering or exaggeration of symptoms. (AR 794.) The plaintiff reported that he spent hours a day playing video games to distract himself from how bad he felt; when not playing games he

---

[3] At the March 2017 ALJ hearing, the plaintiff stated that he did not like Dr. Denton's attitude toward depression: "[H]e was saying, like, in his experience, the best thing for people who are depressed to do is just walk. You just need to get out [and] walk. And I was telling him, you know, the problem is when you're depressed you don't—you can't feel motivated to even get out of bed sometimes. And . . . that didn't seem to matter to him." (AR 59–60.) Miller admitted taking himself off the medication because it did not help but denied telling Dr. Denton that he was better: "Yes that's very inaccurate. I . . . was not feeling better. I came off the meds, but I was not feeling better." (AR 62.)

was miserable, easily frustrated and discouraged, did not feel like doing anything, and cried approximately twice a month for no apparent reason. (AR 797.) He reported that he had left his job at the hospital because he had periods of such extreme anxiety that he could not make himself go in to work.[4] He also stated that church had always been a very important part of his life, but he was "absent from about 66% of all meetings at his church at this time, and this bothers him." (AR 797.) He could still go to the grocery store and other social places without severe panic. (AR 797–98.) He could tolerate other people if he did not have to interact with them, which was what made going to church so difficult—he was expected to interact with all the people because he knew them. (AR 798.) He described increasing "brain fog" that made him afraid to drive because he was so distracted and unable to concentrate. (AR 798.)

He claimed that, as these episodes of brain fog became more severe and frequent, he had gone to see his family treating physician and had taken antidepressants for a short period of time. However, he was wary and distrustful of medications. (AR 798.) His present symptoms, both as reported and observed by the examiner, included motor tension, fatigue, inability to relax, fidgeting, flushing, shortness of breath, difficulty concentrating, and distractability. (AR 800–01.)

According to the Scott/Terrell Report, the results of the MMPI-2 revealed a "technically valid profile with evidence of complex neurotic instability patterns." (AR 801.) With scores above 65 considered above normal, and scores above 75–85 considered to be in the "extreme pathology range," the plaintiff had a score of 96 for depression, 89 for anxiety, and 79 for social

---

[4] The plaintiff referred to these episodes as "panic attacks." The Scott/Terrell Report states that "careful questioning regarding these episodes reveals the extended anxiety to last up to several hours at a time and to involve heightened insecurity and elevated physical tension which make it difficult for him to concentrate, maintain attention, or deal with the normal range of duties in interacting with [others], but he does not experience full hyperventilation syndrome, vertigo, fear of dying during the attack, or extreme fright mixed with paranoia." (AR 797.)

introversion. The Scott/Terrell Report noted that "[f]unctioning on a high level for sustained periods is virtually impossible for" people with these scores and that their dysfunction patterns are "highly resistant to treatment." (AR 802.) The Report also stated that the plaintiff confirmed that he was having a "good day" that day and opined that the plaintiff's high performance on mental processing tasks, therefore, "should not be interpreted to automatically [imply] that excellent focus is present on all days." (AR 802.) The diagnostic impression was that the plaintiff suffered from bipolar disorder NOS "superimposed upon a more long-standing foundation of Generalized Anxiety Disorder." (AR 803.)

Scott and Terrell also completed a Medical Source Statement of Ability to do Work-Related Mental Activities, opining that the plaintiff could not maintain attention for a two-hour segment, maintain regular attendance at a job, work in coordination with or proximity to others, complete a normal workday or work week without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number of rest periods, or accept instructions and respond appropriately to criticism from supervisors. (AR 805.) They were of the opinion that the plaintiff would have good days and bad days, such that his abilities would vary with changes in his mental status. They found that the plaintiff met the listings for depression under 12.04A and 12.04B, based on moderate to marked limitations in the areas of activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. (AR 811, 818.)

State agency psychological consultant Edward Sachs, Ph.D., performed an agency review of the records and provided an opinion in January 2016. Dr. Sachs' assessment presumed that Dr. Denton was a "treating source." (AR 230.) Aside from Dr. Denton's MSO and treatment notes and the Scott/Terrell Report, the only other records that Dr. Sachs considered were treatment

notes from Michelle McBride. Based on these records, Sachs assessed the plaintiff as having mild restrictions in activities of daily living and moderate difficulties in maintaining social functioning and maintaining concentration, persistence or pace, and therefore did not find that the 12.04 A or B listing criteria were met. (AR 233.) He found the plaintiff's statements to be "partially credible" but noted that he had not received "any formal mental health treatment" and that the "TP MER [treating physician medical evidence of record] shows depression with anxiety, which did improve with medication." (AR 233.) Sachs also took into account that the plaintiff had "voluntarily quit his job." (AR 233.) He accorded "greater weight" to the MSO attributed to Denton, whom he characterized as a treating physician, than to the Scott/Terrell Report, which he characterized as a "single 'snapshot' exam that is not consistent with [Denton's] TP MER and MSO." (AR 233.)

The plaintiff began treatment with Nurse Practitioner Lisa Smallwood at Body Mind Consulting in February 2016, primarily for medication and medication checks. Smallwood did not perform counseling services. Smallwood began prescribing Buspar and Prozac in February 2016. As of March 14, 2016, the plaintiff stated that he felt better on the medication but "feels the dosage is wearing off now." (AR 828.) He no longer felt impulses to cut himself, and his wife stated that she saw "a positive change in him as well." (*Id.*) On that particular day, he denied suicidal impulses. (*Id.*) Smallwood switched him to Celexa briefly and then back to Prozac within a couple of weeks. She added Klonopin in April 2016. (AR 858.) In June 2016, the plaintiff reported that he was sleeping no more than four hours per night, had low energy and motivation, was not showering regularly, and felt that his depression was increasing, despite being on Prozac. (AR 859.) Smallwood added Seroquel to his list of medications to help him sleep better. (AR 860.)

State agency consultant Jenaan Khaleeli, Psy.D., performed a Psychiatric Review Technique assessment in April 2016. (AR 241–50.)[5] Khaleeli reviewed the available records and found, as had Sachs, that the plaintiff had severe impairments in the form of affective and anxiety disorders but that neither impairment met the criteria for listings 12.04 or 12.06 for depression or anxiety. She found the plaintiff's complaints to be "partially consistent" with the medical evidence of record and, like Sachs, noted that the plaintiff's depression had "improve[d] with medication" and that the plaintiff had voluntarily quit his housekeeping job at the Medical Center. (AR 250.) The plaintiff alleged worsening symptoms in his request for reconsideration, but Khaleeli noted that "updated [medical evidence of record] suggests [symptoms] improved w/ medication w/ stable mood, sleeping well, good appetite, fair energy and denies SI/HI." (AR 250.) In language identical to that of Sachs, Dr. Khaleeli characterized the Scott/Terrell Report as a "single 'snapshot' exam that is not consistent with TP MER and MSO, which are given greater weight," again presumably referring to Dr. Denton's treatment notes and the unsigned, undated MSO attributed to him. (AR 250.) She concluded that the totality of the evidence supported "moderate mental limitations which would not preclude basic work-related mental functions." (AR 250.)

The plaintiff underwent a second assessment by Scott and Terrell in June 2016, who produced a second report (the "June 2016 Scott/Terrell Report"). This second Report noted that, while the plaintiff had displayed good hygiene in October 2015, on this visit he appeared with matted hair and noticeable body odor and halitosis. (AR 862.) The assessment was similar to that in October 2015, except that the plaintiff displayed worsened symptoms of depression. A second MMPI-2 test was performed, the results of which again confirmed no malingering or

---

[5] Khaleeli's assessment is accompanied by a Residual Functional Capacity assessment completed by Carolyn Parris M.D. (AR 251–56.)

exaggeration of symptoms. The results were "practically identical" to those of the first test, which Scott and Terrell interpreted as confirming the durability and chronicity of the plaintiff's symptoms as well as the legitimacy and accuracy of his self-reports during both visits. (AR 865.)

Scott and Terrell also reviewed the medical record and took issue with Sachs' findings and opinion, specifically including (but not limited to) his findings that the plaintiff had not received any formal mental health treatment and that the plaintiff's depression had improved with medication. "[C]areful review of the record shows that despite well-meaning statements hoping for establishment of permanent improvement, or erasure of problem emotional disorder symptoms, such relief has never been achieved, Indeed, a marked increase in dosage levels and complexity of Rx intervention has been required after the claimant became more honest and open in reporting continuing sleep disturbances and mood control related to depression, and he communicated more clearly the severity of content of his suicidal thoughts and urges. Dr. Sachs nowhere comments regarding these issues." (AR 867.) Scott and Terrell again found that the plaintiff met the listing for 12.04A and B, based on marked difficulty in maintaining social functioning, consistent waking-hours concentration, persistence or pace. They also noted that, while there was "evidence of all four symptom parameters associated with Generalized Anxiety Disorder, the primary symptom complex at this time appears to more completely lie within Section 12.04 diagnostic criteria." (AR 884.)

Lisa Smallwood also completed a Mental Evaluation Report in June 2016. (AR 886–89.) She diagnosed the plaintiff as suffering from bipolar disorder characterized primarily by severe anhedonia or "pervasive loss of interest in almost all activities," along with sleep disturbance, psychomotor disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and severe symptoms of anxiety-related disorder as well. (AR 886,

889.) She assessed him as having marked restrictions or limitations in the activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. (AR 887.) She also found that the plaintiff had suffered repeated episodes of decompensation of extended duration. (AR 887.) In the same assessment, Smallwood noted that the plaintiff "was a referral from Dr. Webb Psychologist that currently sees Mr. Miller's spouse. Due to his lack of insurance he has yet to see Dr. Webb for behavioral therapy." (AR 889.) She noted that he was "tolerating the medication" but "still having days of increased dysthymia." (*Id.*)

The record contains additional records from Smallwood's office from August through December 2016, indicating she continued to see him and to prescribe medications. In August, the plaintiff presented with his spouse and reported that he felt like "this is the best he is going to get. He is still having anxiety issues socially. . . He does admit that he spends a lot of time in bed with little motivation but is trying to get up and dressed for spouse. He states that he is taking one shower a week." (AR 917.) He was advised to make an appointment for "behavioral therapy as medication alone is not sufficient." (AR 918.) The notes from November and December 2016, however, record that the plaintiff's mood was "stable," that he was sleeping well, had fair energy, and denied suicidal ideation, anxiety, panic or agoraphobia. (AR 907, 912.[6])

Miller underwent a follow-up assessment with Scott and Terrell in February 2017. At this appointment, the examiner noted some improvement with medication but "mixed results (as it is with most patients)." (AR 919.) Miller was not observed to have bad breath or body odor this time, but he displayed "grimy fingernails" and reported bathing weekly. (AR 919.) The examiner reviewed the new records in the file and also observed that several of the prescribed medications had known sedative side effects. The follow-up report stated: "Apparently, Mr. Miller's

---

[6] It is unclear whether these responses auto-populated the treatment note.

symptoms of anxiety and hypomanic surges, in addition to depression, insecurity, and lethargy, are sufficiently extreme to allow him to take these medications in combination and report improved mental clarity and emotional control, rather than pervasive somnolence." (AR 920.) Scott and Terrell found this to further confirm the presence of Major Affective Disorder. (AR 920.) The report noted some improvement in the plaintiff's symptoms, including less frequent crying spells and less intrusive suicidal ideation, but he continued to have sleep disturbance and problems in dealing with the public. Scott and Terrell were of the opinion that the plaintiff continued to meet the listing criteria for 12.04A and B.

Michael Scott testified at the administrative hearing in March 2017 before Administrative Law Judge ("ALJ") Brian Lucas and reaffirmed the validity of the assessments. He emphasized that the MMPI-2 is considered "an objective measurement of the existence and severity of emotional disorder and social dysfunction" (AR 94) and that the scales built into the test to gauge for malingering and lying indicated that the results in both of the plaintiff's tests provided a "technically valid profile." (AR 95.) He also testified that the similarities between the two tests conducted eight months apart further confirmed the validity of the test results. (AR 96.) The ALJ gave Scott considerable push-back on the inconsistencies between his assessment of the plaintiff and Smallwood's, in particular regarding the presence or absence of suicidal ideation and improvement of symptoms. Scott testified that he asked questions carefully, implying that other practitioners may not always ask the right questions or ask them the right way. The ALJ understood Scott to mean that he (Scott) was always right. (*See, e.g.*, AR 105–06 ("Is it your testimony . . . that basically the claimant isn't truthful to anybody but you? That you're the only one that can ensure the validity of the claimant's statements?"); AR 107 ("[S]o . . . your position is every instance where there is a conflict you resolve it in favor of the claimant being truthful to

you?"); *id.* ("In all of the cases you've looked at, you've never been wrong?").) Scott's response was that people's conditions fluctuate and, further, that people often tell their treating medical provider what they think the provider wants to hear. (AR 105.) He apparently did not consider Smallwood's records to be inconsistent with his opinions. The ALJ accused him of "consider[ing] the things [he] want[ed] to consider, the things that are convenient to [his] position [while] disregard[ing] anything in the record that seems to oppose what [his] position is." (AR 137.)

Lisa Smallwood was traveling during the hearing and not able to testify live. She submitted a letter instead, which stated that she would like to see Mr. Miller more frequently than she had been, would like to try him on other medications, and would like him to have therapy as well, but she understood that he could not afford any of these. (AR 929.) She noted that she had been prescribing Buspar for anxiety, Klonopin as needed for anxiety, Prozac for depression, and Seroquel as a mood stabilizer and to help him sleep. She had tried to switch him from Prozac to Celexa briefly in March 2016, but "that did not go well and he resumed taking Prozac after a period of less than one month on the Celexa." (AR 929.) She diagnosed him as having bipolar and anxiety disorders but noted that he was "much more . . . depressed than manic." (AR 929.) She described him as continuing to experience "severe depression with occasional bouts of mania of short duration." (AR 929–30.)

She stated that when she meets with Miller, "he is usually disheveled and has a blunted affect." She believed the prescribed medications had improved his symptoms to some extent but still believed that his mental disorders severely limited his ability to function in the workplace or "in his day-to-day existence." (AR 930.) Smallwood also submitted a Mental Disorder Questionnaire in which she opined that the plaintiff suffered from bi-polar disorder characterized

primarily by depression, anxiety disorder, and panic disorder. Although she found that he did not experience thoughts of death or suicide, she assessed him as extremely limited in his ability to understand, remember, and apply information, interact with others, maintain consistency and pace, adapt or manage himself, or perform basically any tasks necessary to the maintenance of a job. (AR 931–35.) She stated that, since beginning treatment with her in February 2016, his impairment had worsened "to the degree of incapacitation and [he] has become a recluse in his home." (AR 935.)

### III.    Standard of Review

When a magistrate judge issues a report and recommendation regarding a dispositive pretrial matter, the district court must review *de novo* any portion of the report and recommendation to which a proper objection is made. Fed. R. Civ. P. 72(b)(1)(C); 28 U.S.C. § 636(b)(1)(C); *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001); *Massey v. City of Ferndale*, 7 F.3d 506, 510 (6th Cir. 1993). Objections must be specific; a general objection to the R&R is not sufficient and may result in waiver of further review. *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995). In conducting its review of the objections, the district court "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

This court's review of the Commissioner's decision, however, is not *de novo*. In Social Security cases under Title II or Title XIV, the Commissioner determines whether a claimant is disabled within the meaning of the Social Security Act and, as such, entitled to benefits. 42 U.S.C. §§ 1383(c), 405(h). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The

regulations at 20 C.F.R. § 404.1520 set forth a five-step sequential analysis to determine whether

an individual is disabled, which the Sixth Circuit has summarized as follows:

> First, the claimant must demonstrate that he has not engaged in substantial gainful
> activity during the period of disability. Second, the claimant must show that he
> suffers from a severe medically determinable physical or mental impairment.
> Third, if the claimant shows that his impairment meets or medically equals one of
> the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, he is deemed
> disabled. Fourth, the ALJ determines whether, based on the claimant's residual
> functional capacity, the claimant can perform his past relevant work, in which
> case the claimant is not disabled. Fifth, the ALJ determines whether, based on the
> claimant's residual functional capacity, as well as his age, education, and work
> experience, the claimant can make an adjustment to other work, in which case the
> claimant is not disabled.

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004).

The court's review of an ALJ's decision is limited to a determination of whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by

substantial evidence. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (quoting

*Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009)); *see* 42 U.S.C. § 405 (g)

(2012) ("The findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive.").

Substantial evidence has long been defined as "more than a mere scintilla. It means such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938); *see also McGlothin v.

Comm'r of Soc. Sec.*, 299 F. App'x 516, 521 (6th Cir. 2008) (stating that substantial evidence is

"more than a scintilla of evidence but less than a preponderance") (internal quotation marks and

citation omitted); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (same).

"The substantial evidence standard . . . presupposes that there is a zone of choice within

which the decision makers can go either way, without interference by the courts." *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "Therefore, if substantial evidence supports an ALJ's decision, the court defers to that finding, 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Id.* (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

**IV.     The Plaintiff's Objections**

The plaintiff poses the following objections to the R&R:

1.     That the magistrate judge erred in finding that the ALJ's error in according great weight to an unauthenticated, undated, and incomplete MSO attributed to Dr. Denton was harmless error;

2.     That the magistrate judge erred in finding that the ALJ properly weighed the medical source opinions in the record;

3.     That the magistrate judge erred in finding that the ALJ did not draw a negative inference from the plaintiff's failure to participate in therapy or case management services without considering his inability to afford such treatment; and

4.     That the magistrate judge erred in finding that the ALJ's decision to deny benefits is supported by substantial evidence in the record.

**V.     Analysis**

All of the plaintiff's objections, considered together, amount to a single objection that the ALJ's decision was not supported by substantial evidence in the record, in particular because the ALJ either considered evidence the plaintiff argues should have been excluded, drew unwarranted negative inferences from some of the evidence, or generally failed to weigh the evidence properly.

As set forth below, the court finds that the ALJ "cherry-picked" the evidence upon which he chose to rely on the basis that it was consistent with his preconceived opinion and that he failed to consider that evidence within the context of the record as a whole. Consequently, the court cannot find that the decision is supported by substantial evidence in the record and will therefore remand the matter to the Commissioner for further consideration.

### 1.     The Weight Accorded the MSO Attributed to Dr. Denton

In his opinion, the ALJ stated as follows regarding the undated, unsigned "DDS-23" form MSO that is presumed to have been submitted by Dr. Denton:

> In an undated medical source statement, Dr. Denton opined the claimant had moderate impairments in memory, concentration, and social ability (Exhibit 6F). Dr. Denton treated the claimant, albeit only for approximately nine months. Further, his opinion is supported by the record, including Ms. Smallwood's subsequent treatment notes and the claimant's reported activities. Therefore, it is given great weight.

(AR 20.) The plaintiff argued in support of his Motion for Judgment on the Administrative Record that the ALJ had inappropriately regarded Dr. Denton as a treating physician and erred in according great weight to his unsigned, undated MSO. The magistrate judge found that the ALJ's reliance on an unauthenticated report constituted a "highly suspect practice," particularly given that the plaintiff had expressly objected to its admission during the hearing. *See* 20 C.F.R. § 1519n(e). At that time, the ALJ assured the plaintiff that he would look into the matter, but there is no evidence in the record that the form was ever authenticated. The magistrate judge nonetheless found that the ALJ's reliance on the unauthenticated MSO was harmless error, both because Dr. Denton was properly considered a treating source, and because the MSO was largely superfluous to the ALJ's findings and ultimate decision. The magistrate judge construed the ALJ's opinion as relying, instead, on the functional limitations articulated by the State agency physicians. (*See* Doc. No. 22, at 15 ("The evidence contained in DDS-23, even if omitted from

the administrative opinion, therefore does not actually impact the ALJ's findings, which obviates the need for remand in this case.").)

The plaintiff now argues that the ALJ erred in giving "great weight" to the undated, unsigned, and incomplete MSO attributed to Dr. Denton and that the magistrate judge erred in finding that the ALJ's error was harmless. (Doc. No. 26, at 1–2.) The plaintiff argues that the magistrate judge's conclusion was based on two additional incorrect conclusions: (1) that Dr. Denton qualified as a treating source; and (2) that the MSO was largely superfluous to the ALJ's final determination of disability. The plaintiff insists that the "defective DDS-23 opinion is the very lynchpin of the ALJ's finding that Mr. Miller was not disabled," thus necessitating remand. (Doc. No. 26, at 2–3.)

As an initial matter, it is clear that both the magistrate judge and the ALJ erred in concluding that Dr. Denton qualified as a treating source and, moreover, that the ALJ erred in according "great weight" to an undated, unsigned medical source opinion. The magistrate judge stated, somewhat ambiguously,[7] that Dr. Denton had treated the plaintiff on "multiple occasions in 2015." (Doc. No. 22, at 13.) The ALJ noted that "Dr. Denton treated the claimant, albeit for only approximately nine months." (AR 20.) That determination is apparently based on the MSO itself, which gave "9 months" as the "approximate length of time" the doctor had seen the patient. (AR 840.) In fact, although Denton had been Miller's pediatrician in the past, he had not seen him for many years prior to 2015 and had never provided mental health treatment. Dr. Denton saw Miller twice in the spring of 2015, in March and April. Under the circumstances presented here, these two examinations, six weeks apart from one another, did not make Dr. Denton a treating physician, as they "did not give Dr. [Denton] a long term overview of

---

[7] To this court's mind, "multiple times" implies some number greater than two.

[Miller's] condition." *Yamin v. Comm'r of Soc. Sec.*, 67 F. App'x 883, 884 (6th Cir. 2003); *accord Downs v. Comm'r of Soc. Sec.*, 634 F. App'x 551, 556 n.2 (6th Cir. 2016) ("[I]t is worth noting that the handful of visits [the claimant] had with Dr. Murphy do not necessarily render Dr. Murphy a 'treating source' with an 'ongoing treatment relationship' with [the claimant]." (citing 20 C.F.R. § 404.1502; *Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1000 n.3 ("[I]t is questionable whether a physician who examines a patient only three times over a four-month period is a treating source—as opposed to a nontreating (but examining) source."); *Boucher v. Apfel*, No. 99-1906, 2000 WL 1769520, at *9 (6th Cir. Nov. 15, 2000) (finding that a doctor who had examined the claimant three times over a two-year period was "not a treating source"))). Dr. Denton qualified, not as a treating physician, but as "a nontreating (but examining) source." *Helm*, 405 F. App'x at 1000 n.3.

The more important question is whether this error was harmless, as the magistrate judge found. The plaintiff argues that the MSO was "the very lynchpin of the ALJ's finding that Mr. Miller was not disabled," and that the ALJ's failure to exclude it from consideration requires remand. In particular, he takes issue with the magistrate judge's conclusion that the ALJ's residual functional capacity findings were based, not on the MSO, but on the "functional limitations delineated by the State agency physicians." (Doc. No. 22, at 15.) The plaintiff insists, to the contrary, that the basis for those limitations was "none other than the defective DDS-23 opinion." (Doc. No. 26, at 4.)

It is unclear from the record to what extent the State agency consultants' and the ALJ's assessments of Dr. Denton's opinions were erroneously based on his being characterized as a physician who actually treated the plaintiff over a period of nine months and to what extent they relied on the incomplete, unauthenticated MSO. For that reason, the court finds that the error is

not harmless and that substantial evidence does not support the amount of weight accorded that opinion.

### 2. *The Weight Accorded the Medical Source Opinions in the Record*

The plaintiff also argues that the ALJ erred in according any weight at all, much less "great weight," to the unauthenticated MSO attributed to Dr. Denton and in according "significant weight" to the opinions of the State agency consultants who did not review the entire record, while at the same time according essentially no weight to the opinions of Dr. Terrell, as set forth in the Scott/Terrell reports. More particularly, he argues that: (1) Terrell and Scott performed three lengthy, comprehensive evaluations spaced over sixteen months and had the opportunity to review all the medical evidence in the record, as a result of which they had a much broader evidentiary basis for their opinions and an "indisputably greater" knowledge of the plaintiff's impairments than the State agency consultants; (2) although the ALJ found the functional limitations identified by Terrell and Scott to be "extreme" and without support from evidence in the record, a great deal of evidence supports their opinions, including their own objective test results, the testimony and statements of the plaintiff's wife and mother-in-law, the plaintiff's work history and unsuccessful attempts at work, the statement of his former employer, and Lisa Smallwood's treatment records and assessments; and (3) Smallwood's treatment notes are not inconsistent with Scott's and Terrell's findings and do not substantiate the ALJ's repeated claims that the plaintiff improved significantly with medication.

The ALJ accorded "significant weight" to the opinions of the State agency consultants, "to the extent consistent with the record." (AR 23.) Similarly, he found Dr. Denton's incomplete MSO, finding that the plaintiff had moderate impairments in memory, concentration, and social ability, to be "supported by the record including Ms. Smallwood's subsequent treatment notes and the claimant's reported activities." (AR 20.) For that reason, he gave Dr. Denton's opinion

"great weight."

Conversely, the ALJ gave "little weight" to Scott's and Terrell's opinions on the basis that (1) they "only" examined the claimant on three occasions; their opinions were "overly pessimistic when viewed in light of the treatment notes, which reveal the claimant's condition was improved by "mere medication"; and their assessment was contradicted by the plaintiff's activities of daily living and work history. (AR 22.) In other words, his reasons for not crediting their opinions were essentially the inverse of his reasons for giving great or significant weight to the opinions of Denton, Sachs, and Khaleeli. The question is whether the factors upon which his opinions are based are, themselves, supported by substantial evidence.

The court finds that these factors, considered closely, are not substantially supported by the record. First, while Scott and Terrell "only" saw the plaintiff three times, those three visits entailed in-depth assessments, with interviews and two MMPI-2 tests—which Scott noted is "considered an objective measurement of the existence and severity of emotional disorder and also social dysfunction." (AR 94). Dr. Denton saw the plaintiff only twice in ordinary office visits, while the State agency consultants did not examine him at all. Thus, it is difficult to understand why the number of visits, in this particular case, would provide justification for discounting the opinions of Scott and Terrell more than the opinions of the other practitioners who saw him fewer times or not at all.

Second, the ALJ's opinion relies heavily upon his conclusion that the medical record establishes that medication improved the plaintiff's condition. (*See, e.g.*, AR 20 ("The claimant also participated in medication management . . . with Lisa Smallwood. . . . The treatment was effective.").) The record, considered in its totality, actually reveals that such improvement was marginal and not necessarily sustained over time. The plaintiff reported to Nurse Practitioner

Michelle McBride that two or three medications she tried him on did not help his depression at all, though they helped his anxiety slightly. Dr. Denton's notes reflect that the plaintiff, during his second and last office visit, seemed improved on medications, but the treatment notes reflect that the plaintiff stopped taking the medication because it was not helping and he did not like how it made him feel. (AR 762.) The plaintiff testified at the hearing that the medications did not make him feel better and that he did not tell Dr. Denton that they did. (AR 62.) When he began seeing Smallwood a year later, the plaintiff displayed substantial improvement after one or two months on medication, in March of 2016 (AR 828), but that improvement was completely eroded by June and August 2016. (*See* AR 859 (noting in June 2016 that the plaintiff was "not sleeping more than 4 hours a night," had low energy and minimal interest in daily activities, was "not wanting to shower for a week," and "feels like prozac is not working as well as initially. He states that the depression seems to be increasing."), 917 (as of August 2016, plaintiff was "still having anxiety issues socially," "admit[ted] that he spends a lot of time in bed with little motivation but is trying to get up and dressed for spouse," and was "taking one shower a week").) In November and December 2016, he was somewhat better. The notes from that time frame indicate "mood stable," "sleeping well," "denies psychosis," "denies suicidality or homicidality," "denies anxiety," and "no panic or agoraphobia"; the plaintiff appeared "fairly groomed and nourished" and "in good spirits," and the assessment was "stable." (AR 907–08, 912–13.) Stable, of course, in this context, could simply mean that his condition had not changed substantially, and the treatment notes do not reflect an in-depth assessment of his condition.

Regardless, Scott's and Terrell's follow-up assessment in February 2017 synthesized the fluctuations in mood reflected by the record. They noted that

> psychotropic medication treatment . . . has been applied with mixed results (as it is with most patients). Some aspects of reported and observed depression and

> mania have been curtailed by Rx, but mood disturbance and problems with concentration, attention, anxiety, and accomplishment of extended concentration tasks and complex tasks, leading to his display of recurring fatigue and slow completion of even ordinary tasks, persist.

(AR 919–20.) The plaintiff still appeared "insecure, anxious, and depressed." (AR 919.) Although his personal hygiene at that appointment was not as bad as it had been in June 2016, the plaintiff still had "grimy" fingernails and reported showering only weekly. (AR 920.)

In other words, although the record contains some evidence to support the ALJ's conclusion that the plaintiff's symptoms improved with "mere medication," the record as a whole portrays a patient with some fluctuations in mood but whose baseline condition was substantially depressed. Moreover, according to Terrell and Scott, as well as Smallwood, some periods of improvement were to be expected in light of the plaintiff's diagnosis of bipolar disorder. Further, by the fall of 2016, at which time Smallwood noted on two visits that the plaintiff's condition was "stable," he had, as the plaintiff argues, "structured his life to eliminate stress as much as possible." (Doc. No. 26, at 12.) Such stability also appeared to have been achieved at the cost of the plaintiff's being medicated with "four separate [prescriptions] with known sedation side-effects." (AR 920.) Even then, his mother-in-law and wife both testified that the plaintiff basically stayed in his bedroom all day. (*See* AR 165, 166.) In sum, the conclusion that the plaintiff's condition was significantly ameliorated by medication, although it is supported by some evidence in the record, is not supported by substantial evidence when the record as a whole is taken into consideration. In particular, the ALJ failed to consider the plaintiff's diagnosis of bipolar disorder and the extent to which the condition could be expected to cause the plaintiff's symptoms to ebb and flow.

Likewise, the ALJ's determination that Scott's and Terrell's assessments were contradicted by the plaintiff's reported activities of daily living does not hold up under scrutiny

of the record as a whole. These activities, as noted by the ALJ, included paying bills, cooking, driving, grocery shopping a few times a month, attending church monthly, and living with family. (*See* AR 18 (citing Exhibits 1E & 9E).) The ALJ found that these reported activities supported a conclusion that the plaintiff could learn, recall and use information to perform work activities, and could relate to and work with supervisors, co-workers and the public. In addition, he noted that the plaintiff's hobbies included playing guitar and video games, which "suggests he can focus on work activities and stay on task at a sustained rate." (AR 18.) The ALJ also emphasized the plaintiff's work attempts as supporting a conclusion that he could work.

Exhibit 1E is an Adult Function Report completed by the plaintiff on October 15, 2015. On it, the plaintiff states that the only "cooking" he could handle was microwaving frozen dinners. He found anything more complicated too stressful. (AR 433.) He stated that he was physically capable of performing household chores, including emptying the dishwasher and taking out the trash, but "rarely [feels] well enough to help with household chores." (AR 433.) He had to be asked to help and, even then, "sometimes I still can't make myself do anything." (AR 433.) He noted that he was capable of driving, but that, if his brain felt "foggy," he did not feel safe. He added, "I can usually drive, but it is becoming increasingly difficult." (AR 434.) He reported that he was "able" to pay bills but did not indicate that he actually engaged in paying bills, much less on a regular basis. (AR 434.) He played video games and watched TV to distract himself when he felt bad. But with no indication that he played well or consistently, it is difficult to understand how playing video games and watching television constitutes proof of an ability to perform work-related activities. Regarding playing the guitar, the plaintiff noted that he only did so when he was "feeling good," as a result of which he only played "a couple of times a month." (AR 435.) Similarly, he "used to enjoy going to church and social gatherings, but now these

things make me feel nervous and stressed, so I don't go." (AR 436.) He reported attending church no more than once a month.

Exhibit 9E, the other exhibit cited by the ALJ, is a March 28, 2016 Adult Function Report. Here, the plaintiff stated: "Most days, my anxiety & depression make me unable to leave the house, or be around people. Even having something I have to do, or somewhere I have to be, scheduled a few days off will cause me to have bad days leading up to the appointment because I feel worried and anxious about it." (AR 514.) His reported daily activities, again, consisted largely of sleeping or playing video games. (AR 515.) Showering caused him anxiety so he only bathed once every three to five days and had to be reminded to brush his teeth. (AR 515, 516.) He still reported microwaving frozen dinners on a daily basis, unless he was having a particularly bad day, in which case "even trying to decide what to eat causes me to spiral and feel worse." (AR 516.) If prodded, he was capable of unloading the dishwasher and taking the trash outside. (AR 516.) He reported riding or driving in a car rarely, and typically not alone because it made him feel anxious. Shopping for food consisted of quick trips to get "a couple of things. . . as fast as I can." (AR 517.) He reported playing guitar and going to church even less frequently than before. (AR 518.)

The plaintiff's statements on the Adult Function Reports were consistent with his testimony at the hearing, as well as that of his wife and mother-in law. The ALJ did not make an adverse finding regarding the plaintiff's credibility, and he failed to adequately explain how these reported activities, as described by the plaintiff and the other witnesses, support the ALJ's conclusion that the plaintiff could engage in work-related activities on a sustained basis. As the Seventh Circuit has noted in a case involving a plaintiff diagnosed with bipolar disorder, the fact that such a claimant "dresses appropriately, shops for food, prepares meals and performs other

household chores, is an 'active participator [sic] in group therapy,' is 'independent in her personal hygiene,' and takes care of her 13-year-old son" did not contradict her doctors' assessments that she was incapable of working. *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). Rather, these abilities only established that "the plaintiff is not a raving maniac who needs to be locked up. She is heavily medicated, and this enables her to cope with the challenges of daily living, and would doubtless enable her to work on some days." *Id.* In that case, the court found that the ALJ had erred in disregarding "uncontradicted evidence that the plaintiff's son cooks most meals, washes the dishes, does the laundry, and helps with the grocery shopping." *Id.*; *see also Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248–49 (6th Cir. 2007) (finding that the ALJ's description of the plaintiff's daily activities mischaracterized the plaintiff's testimony and failed to account for the effects of the activities); *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) ("[T]the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. One does not need to be utterly incapacitated in order to be disabled." (citations omitted)); *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 370 (6th Cir. 1984) ("'Disability' under 42 U.S.C. § 423 does not require [the plaintiff] to lie at death's doorstep or to be totally incapacitated every day for 12 months, to be unable to engage in substantial gainful activity for that same period."); *Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir. 1967) (holding under the facts of that case that the plaintiff's ability to "perform simple functions, such as driving, grocery shopping, dish washing and floor sweeping, does not necessarily indicate that . . . [he] possesses an ability to engage in substantial gainful activity. Such activity is intermittent and not continuous, and is done in spite of the pain suffered by [the plaintiff].").

In this case, the plaintiff lives with his wife and her parents, and the evidence is undisputed that he spends most of his time in his room, performs minimal household chores, engages in minimal self-care, and only sporadically feels well enough to engage in activities he once enjoyed. Moreover, as the Seventh Circuit also observed, "[a] person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days." *Bauer v. Astrue*, 532 F.3d 606, 608–09 (7th Cir. 2008). The ALJ did not take into account the plaintiff's undisputed description of his activities or make a finding that the plaintiff's testimony in that regard lacked credibility, nor did he factor into his analysis the effect of the plaintiff's diagnosis or prescribed medications. Consequently, his conclusion that Scott's and Terrell's assessments are contradicted by the plaintiff's engagement in activities of daily living is not supported by the actual evidence in the record.

Finally, the ALJ considered the plaintiff's attempts to work as evidence in support of the weight accorded the experts' opinions, repeating that the plaintiff "voluntarily" quit his job, presumably as opposed to being fired. The plaintiff testified, without contradiction, that his job as a housekeeper at Stone Crest Medical Center was the event that first triggered him to seek mental health treatment. (*See* AR 755 (Michelle McBride's treatment note documenting the plaintiff's statement that his depression and anxiety had increased when he started the job at the Medical Center); AR 796 (Scott/Terrell Report noting that the plaintiff stated he had left the Medical Center job "due to reported panic attacks"); AR 63 (the plaintiff's hearing testimony, stating he "quit the job at the hospital [because] [i]t was too stressful"); AR 143–44 (Miranda Miller's testimony regarding the effect of the job on her husband: "He was very stressed about it. . . .It was very burdensome on him. . . . He had to come home early several times because of

panic attack[s], which his boss – you know, he cleared it with his boss. . . . And there was one morning where he drove to work, and he just could not get out of the car."). The plaintiff was not fired from the Medical Center job, but the ALJ's conclusion that he simply "voluntarily" left a job that he was capable of performing is not supported by the evidence in the record.

In addition, the ALJ observed that the plaintiff worked as a substitute teacher during the relevant period and found that this fact suggested his impairments were not as severe as alleged, regardless of the fact that it was part-time work that did not meet the definition of substantial gainful activity. (AR 24.) Again, however, nothing in Scott's and Terrell's assessments conflicts with the plaintiff's reported work as a substitute teacher. The plaintiff testified that he was able to select jobs that would be less stressful and he was rarely able to work more than two or three days a week. (AR 49, 50, 52, 58–59.)[8] He testified that the job was not intellectually or otherwise demanding, but he still was rarely able to make himself go five days a week. In addition, his ability to return to work as a substitute teacher appears to have been significantly curtailed following the apartment fire in April 2015 and again following the unsuccessful move to Oregon in the summer of 2015.

In sum, all of the reasons the ALJ provided for according minimal weight to the opinions of Scott and Terrell, and greater weight to the opinions of Denton, Sachs, and Khaleeli, collapse under the weight of the record as a whole. As a result, the weight accorded to the various

---

[8] The magistrate judge's finding that the testimony regarding the reason for the plaintiff's leaving the Medical Center job was conflicting (*see* Doc. No. 22, at 19) is actually not supported by the record. The plaintiff never testified that he quit the part-time substitute teaching jobs because of anxiety. (AR 187–88.) Instead, the magistrate judge was confused about the timeline of events. The magistrate judge believed that the plaintiff testified first that he quit his job substitute teaching because of anxiety and later testified that he quit because they were moving to Oregon. (*See* Doc. No. 22, at 19.) In reality, the plaintiff testified that he quit the housekeeping job at the hospital because of his anxiety about it, and he quit the part-time student teaching job because of the move to Oregon.

opinions is not supported by substantial evidence.

### 3. The Plaintiff's Inability to Pay for Additional Treatment

The plaintiff argues that the ALJ inappropriately drew a negative inference from the plaintiff's failure to participate in therapy or case management services without considering his inability to afford such treatment and that the magistrate judge erred in finding to the contrary.

It is well established in the Sixth Circuit that, if a claimant "cannot afford the prescribed treatment or medicine, and can find no way to obtain it, the condition that is disabling in fact continues to be disabling in law," even if the condition would otherwise be remediable through treatment. *McKnight v. Sullivan*, 927 F.2d 241, 242 (6th Cir. 1990) (internal quotation marks and citations omitted). Generally, however, if the plaintiff does not establish an inability to afford treatment or otherwise obtain it, an ALJ may consider a claimant's failure to obtain treatment or to comply with recommended treatment as a reason to discount his credibility. *See Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988) (concluding that the ALJ properly discounted the claimant's credibility where he failed to follow prescribed treatment); S.S.R. 96–7p, 1996 WL 374186, at *8 (noting that "the individual's statements may be less credible if . . . the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure.").[9]

The transcript reflects a contentious discussion on this topic between the ALJ and plaintiff's counsel at the March 2017 hearing, during which the ALJ reprimanded counsel for his use of leading questions to elicit testimony from witnesses regarding the plaintiff's financial

---

[9] The Sixth Circuit has also repeatedly recognized that "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Burton v. Apfel*, 208 F.3d 212 (6th Cir. 2000) (quoting *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989)); *Blankenship*, 874 F.2d 1116, 1124 (6th Cir. 1989) (holding that failure to seek medical care "should not be a determinative factor in a credibility assessment" where the claimant is operating under a mental impairment).

situation. (AR 153–56.) Regardless, the plaintiff's wife testified that they would not be able to pay for counseling for the plaintiff, since he was uninsured. She conceded that her parents probably could pay the cost of counseling, but it would be a "burden." (AR 157.) The plaintiff testified that Lisa Smallwood would "like [him] to see the psychologist . . . but my ability to pay is the reason I don't see one at the moment or an inability to pay." (AR 75.) Lisa Smallwood's statement and some of her treatment notes and reports also reflect a concern about the plaintiff's inability to pay for different treatment modalities or medications, since he was uninsured. Further, the ALJ himself stated on the record that he understood that the plaintiff had limited financial resources. (AR 155 ("You've asked the question to each witness to suggest that finances are a problem. I get that. I understand that contention, and I don't even dispute it. If he has no income, I think it's obviously something that I need to consider.").)

In light of the evidence in the record, it was improper for the ALJ to consider the plaintiff's failure to seek counseling as a factor relevant to his ultimate determination that the plaintiff was not disabled.

### 4. Whether the ALJ's Denial of Benefits Is Supported by Substantial Evidence

As previously stated, in deciding whether to affirm the Commissioner's decision, it is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record and was made pursuant to proper legal standards. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence means "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted). The Sixth Circuit has conceded that this standard is "imprecise, but probably affords as much clarity as is possible." *Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 388 (6th Cir. 1978).

Substantiality of the evidence must be based upon the record taken as a whole. *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980). "Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the 'substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" *Beavers*, 577 F.2d at 387 (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). "We may not focus and base our decision entirely on a single piece of evidence, and disregard other pertinent evidence." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (citation omitted).

As set forth above, the ALJ improperly considered the unsigned, undated MSO attributed to Dr. Denton and improperly gave it great weight. This court has also found that the amount of weight attributed to the various medical opinions in the records is not supported by substantial evidence and that the ALJ failed to consider the plaintiff's inability to pay when drawing a negative conclusion based on his failure to seek additional treatment. In light of all of these findings, the court finds that the ALJ's ultimate decision to deny benefits itself is not supported by substantial evidence.

Certainly, there is evidence in the record that supports the ALJ's decision. The ALJ, however, improperly focused only on the evidence that substantiated his conclusion at the expense of the evidence in the record that "fairly detracts from its weight.'" *Beavers*, 577 F.2d at 387. Because he did not consider the evidence that weighed against a finding of disability within the context of the record as a whole, remand is required.

## V.    Conclusion

When, as here, the non-disability determination is unsupported by substantial evidence, the court must decide whether to reverse the ALJ and remand the matter for rehearing, or reverse and grant benefits. *Melkonyan v. Sullivan*, 501 U.S. 89, 100 (1991). The court has authority to

affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g).

Generally, benefits may be awarded immediately "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994); *see also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990). The court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176.

In this case, while the court finds that the Commissioner's decision is not supported by substantial evidence and the proof of disability is certainly strong, the court will remand to the Commissioner for the purpose of appropriately weighing the evidence in the record.

An appropriate order is filed herewith.

ALETA A. TRAUGER
United States District Judge